UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
OCALA DIVISION

**LM INSURANCE CORPORATION,**

    **Plaintiff,**

v.                                                           Case No: 5:19-cv-274-Oc-30PRL

**OCCIDENTAL FIRE AND CASUALTY
COMPANY OF NORTH CAROLINA
and HARNAUTH SEWSANKAR,**

    **Defendants.**

## REPORT AND RECOMMENDATION[1]

This insurance coverage declaratory judgment action is before me upon referral of several motions, including cross motions for summary judgment filed by LM Insurance Company and Occidental Fire and Casualty Company of North Carolina (Docs. 44 & 55) and motions to exclude expert testimony (Docs. 37 & 53). For the reasons explained below, I recommend that both motions for summary judgment be granted in part and denied in part. Further, because the recommendations regarding summary judgment would moot the parties' motions regarding expert testimony, I recommend that those motions be denied as moot.

### I. BACKGROUND

This case arises out of a motor vehicle accident and involves a dispute about insurance coverage between Plaintiff LM Insurance Company ("Liberty") and Defendant Occidental Fire

---

[1] Within 14 days after being served with a copy of the recommended disposition, a party may file written objections to the Report and Recommendation's factual findings and legal conclusions. See Fed. R. Civ. P. 72(b)(3); Fed. R. Crim. P. 59(b)(2); 28 U.S.C. § 636(b)(1)(B); Local Rule 6.02. A party's failure to file written objections waives that party's right to challenge on appeal any unobjected-to factual finding or legal conclusion the district judge adopts from the Report and Recommendation. See 11th Cir. R. 3-1.

and Casualty Company of North Carolina ("Occidental"). Liberty seeks a determination regarding which of two policies are primary, as well as the amount of uninsured or underinsured motorist ("UM") coverage that Occidental must provide to Defendant Harnauth Sewsankar.

The undisputed facts are as follows. On September 9, 2017, Defendant Harnauth Sewsankar was involved in a motor vehicle accident while operating a 2008 Nissan Maxima. Sewsankar was the named insured under a personal automobile insurance policy, No. AO5-251-014011-4077, issued by Liberty. The only vehicle listed under the Liberty policy, however, was a 2009 Nissan Altima. The Liberty policy provides UM coverage for $100,000 per person, and $300,000 per accident.

Meanwhile, the 2008 Nissan Maxima operated by Sewsankar during the accident was, at least at one time in the past, owned by Main Street Collision, Inc. Main Street was insured by Occidental under a commercial auto policy with liability coverage of $100,000 and UM coverage of $20,000. Whether or not Main Street still owned the Nissan Maxima at the time of the accident, or whether there had been a transfer of ownership of the vehicle to Sewsankar is a primary issue in the case.

As the facts reveal, Sewsankar was friends with the owner of Main Street. (Doc. 55-5, p. 8). While not an auto mechanic himself, Sewsankar worked as a supervisor at an electronics manufacturer, had some knowledge of electronics, and apparently enjoyed refurbishing automobiles. In the past, he had bought a car from Main Street. (Doc. 57-5, p. 15).

Being an auto body shop, Main Street often had damaged or non-working vehicles on its lot. Sewsankar was looking for a car for his teenage son and inquired about the Nissan Maxima on Main Street's lot. The vehicle had been parked at the lot and not running for several years. (Doc. 55-5, p. 19). At some point during the summer of 2017, Sewsankar paid $1,000 cash toward the

purchase price of $5,0000 for an interest in the car. (Doc. 57-5, p. 17). According to Sewsankar, the agreement was that the money would go toward the Maxima and, if it was able to be properly repaired, he would pay the remainder of the purchase price of $5,000. If the Maxima could not be repaired, the $1,000 payment would go toward a different car. Sewsankar explained that, following that initial payment "the vehicle was not drivable, so it was still [at Main Street]." (Doc. 57-5, p. 18).

During about three months prior to the accident, Sewsankar took the Maxima out "a few times a month, on the weekend," to get repairs done, to run diagnostic tests on the vehicle or to do repairs himself. (Doc. 55-5, p. 16). On one occasion, Sewsankar changed the fan mechanism. (Doc. 55-5, p. 18). If the car had been fully repaired, Sewsanskar intended to complete the deal and take title on the car with the intention to give it to his teenage son. (Doc. 55-5, p. 23). Prior to the accident, a lingering issue was that the engine light was on, and Sewsankar was trying to determine why. (Doc. 55-5, p. 24). Typically, Sewsankar would pick the car up on the weekend to work on it and then return it. (Doc. 55-5, p. 26).

On the day of the accident, Sewsankar planned to take the car for a long distance test drive. (Doc. 55-5, p. 18). He drove the car to his work in Gainesville on Friday, and then planned to take it to Sewperb Auto the next day to run diagnostic tests on the vehicle. (Doc. 57-5, pp. 23-26). Sewsankar worked a late shift in Gainesville and was returning home via the Florida Turnpike when the accident occurred shortly after 1:00 a.m. in the morning. (Doc. 57-5, p. 37).

Subsequently, Defendant Sewsankar presented claims for UM coverage to both Liberty and Occidental, including claims that he needs continued medical care. Sewsankar has demanded the UM coverage limits of the Liberty policy ($100,000) to settle his claim. (Doc. 26-4).

On May 11, 2018, Liberty sent a letter to Occidental stating that Sewsankar may qualify

for UM coverage under the Occidental policy and requesting information regarding Occidental's position as to coverage under its policy. (Doc. 26-5). Occidental denied coverage to Sewsankar and issued a coverage position letter to Liberty. (Docs 26-6 & 26-7). Occidental denied the claim because "the vehicle being driven by Mr. Sewsanker was not owned by the insured; Mr. Sewsanker himself is not an insured; and Mr. Sewsanker was the liable party in the accident." (Doc. 26-6). Occidental also issued a coverage position letter to Liberty. (Doc. 26-7). Occidental concluded that its policy did not apply to the loss, and Occidental would not be making any payments related to the loss. (Doc. 26-7).

On August 2, 2018, Liberty sent a letter to Occidental requesting additional information regarding Occidental's coverage position. Occidental responded that Sewsankar did not qualify as an insured under its policy and because he was the at-fault party, UM benefits were not available to him. (Doc. 26-9)

Then, on September 6, 2018, Liberty responded to Sewskanar's counsel as follows:

> Main Street Collision was insured by Occidental Insurance Company or an affiliated entity under insurance policy number CG0016091. The insurance policy provided uninsured/underinsured motorist coverage in the amount of $20,000. Based on our review of the Occidental insurance policy, Mr. Sewsankar should qualify as an insured for purposes of uninsured/underinsured motorist coverage. We understand that Occidental Insurance Company denied coverage on the grounds that Main Street Collision did not own the Maxima and based on the Combined Garage Exclusion. However, Mr. Sewsankar's testimony was that Main Street Collision did own the vehicle. In addition, the Combined Garage Exclusion applies if the Maxima had been "surrendered" to Mr. Sewsankar pursuant to a "sale, conditional sale, gift, abandonment or lease." Based on our understanding of the facts, Main Street Collision did not surrender the vehicle to Mr. Sewsankar and there was no "sale, conditional sale, gift, abandonment or lease."

(Doc. 26-10). Liberty stated that the "LM Insurance Corporation policy provides: Any insurance we provide with respect to a vehicle you do not own will be excess over any other collectible

insurance." (Doc. 26-10). Liberty further explained that "Mr. Sewsankar testified that Main Street Collision owned the Maxima. Thus, the Occidental Insurance Company policy would provide primary uninsured/underinsured motorist coverage." (Doc. 26-10).

Liberty contends that it is unsure of its obligations to Sewskanar because of the position taken by Occidental, and thus seeks a declaratory judgment "as to whether or not Occidental is under an obligation to provide $100,000 or $20,000 in UM coverage and whether Occidental's policy is primary to the Liberty policy." (Doc. 26, p. 6). Liberty seeks declaratory judgment against Occidental and Sewsankar pursuant to the 28 U.S.C. § 2201 and asks the Court: (1) to declare that Liberty's UM coverage is excess to Occidental's UM coverage; and (2) to make a determination regarding the amount of UM coverage afforded from Occidental. This case is currently before the Court upon referral of motions for summary judgment filed by both Liberty and Occidental.

Meanwhile, individual defendant Harnauth Sewsankar has not made an appearance in this action. On May 19, 2020, the Clerk entered default against him pursuant to Fed. R. Civ. P. 55(a).

## II. LEGAL STANDARDS

Summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A movant carries her burden by showing that there is an absence of evidence supporting the non-movant's case. *Denney v. City of Albany,* 247 F.3d 1172, 1181 (11th Cir. 2001). The burden then shifts to the non-movant, who must go beyond the pleadings and present affirmative evidence to show a genuine issue for trial. *Porter v. Ray,* 461 F.3d 1315, 1320 (11th Cir. 2006). Affidavits submitted in relation to a summary judgment motion must be "based on personal knowledge and must set forth facts that would be admissible under the Federal Rules of Evidence." *Josendis v. Wall to Wall Residence Repairs, Inc.,* 662 F.3d 1292, 1314–15 (11th Cir. 2011).

A genuine dispute of material fact exists if "the evidence is such that a reasonable jury could return a verdict" for the non-movant. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). Which facts are material depends on the underlying substantive law. *Id.* The Court must view the evidence and all reasonable inferences drawn from the evidence in the light most favorable to the non-movant. *Battle v. Bd. of Regents,* 468 F.3d 755, 759 (11th Cir. 2006). However, "[a] court need not permit a case to go to a jury ... when the inferences that are drawn from the evidence, and upon which the non-movant relies, are 'implausible.'" *Mize v. Jefferson City Bd. of Educ.,* 93 F.3d 739, 743 (11th Cir. 1996).

Further, under Florida law, the interpretation of an insurance contract is a matter of law to be decided by the court. *Gas Kwick, Inc. v. United Pac. Inc. Co.*, 58 F.3d 1536, 1539 (11th Cir. 1995). The Eleventh Circuit has noted that "insurance contracts are to be construed in a manner that is reasonable, practical, sensible, and just.... Terms used in a policy are given their plain and ordinary meaning and read in the light of the skill and experience of ordinary people. Provisions that exclude or limit liability of an insurer are construed more strictly than provisions that provide coverage." *United States Fire Ins. Co. v. Freedom Village of Sun City Ctr.*, 279 Fed.Appx. 879, 880–881 (11th Cir.2008) (internal citations omitted).

### III. DISCUSSION

The threshold issue in dispute between the parties is whether Main Street or Sewsankar owned the 2008 Nissan Maxima involved in the accident. Both Occidental and Liberty have moved for summary judgment on that issue. (Docs. 44 & 55).

Liberty has also moved for summary judgment on the issues of whether the UM limits under the Occidental policy equal the bodily injury liability limits of $100,000, and whether the UM coverage provided by the Occidental policy is primary. Meanwhile, Occidental has moved for

summary judgment that its policy does not afford UM coverage to Sewsankar because he owned the Maxima, that even if Occidental owes UM benefits to Sewsankar, those benefits are not primary and should be shared on a pro-rata basis between Occidental and LM, and that the Occidental policy only affords UM benefits of $20,000. The Court will first turn to the issue of ownership.

### A. Ownership of the 2008 Nissan Maxima

Liberty has moved for summary judgment that the Nissan Maxima was not sold to Sewsankar, and Occidental has moved for summary judgment that it was. Under Florida law, "whether a sale was actually consummated is a question of law to be determined by the facts in evidence." *State Farm Mut. Auto Ins. Co. v. Hartzog*, 917 So. 2d 363, 365 (Fla. 1st DCA 2005). Liberty's theory is that the Nissan Maxima was owned by Main Street and that ownership was never transferred to Sewsankar, who was merely test driving the vehicle and inspecting it for the purposes of determining whether he would consummate a sale. Main Street's theory is that Sewsankar purchased the vehicle and was enjoying beneficial ownership of the Maxima on the date of the accident.

#### 1. Title of the 2008 Nissan Maxima Could Not Have Been Transferred to Sewsankar.

As a preliminary matter, Liberty argues that the title of the 2008 Nissan Maxima could not have been transferred to Sewsankar at the time of the accident because it was a salvage vehicle that had never been properly titled in Florida. Occidental does not dispute that Main Street purchased the 2008 Nissan Maxima in 2013, obtained a Salvage Certificate, and owned the vehicle at some point in the past. It is undisputed that the Maxima was not registered in Sewsankar's name, and Occidental does not dispute that it was untitled and unregistered at the time of the accident.

Liberty contends that the salvage certificate creates a presumption that Main Street owns the Maxima, citing *Johnson v. Sentry Ins.*, 510 So. 2d 1219, 1220 (Fla. 5th DCA 1987). In *Johnson*, the court acknowledged a presumption of ownership created by a certificate of title to a motor vehicle. Although not the same as a certificate of title, the salvage certificate is somewhat analogous. At a minimum, that a salvage certificate was issued to Main Street in 2013 is significant evidence of ownership. And, there appears to be no dispute that Main Street owned the vehicle when Sewsakar inquired about it.

Without contradiction, Liberty represents that the salvage certificate lists the Maxima as a "total loss" due to "flood damage." (Doc. 44, p. 13). Liberty asserts that this means that the vehicle is a "salvage" as defined by Florida law. *See* Florida Statute § 319.30(1)(t) (defining "salvage" as "a motor vehicle or mobile home which is a total loss). Florida Statute § 319.14(1) defines a "rebuilt vehicle" and prohibits the sale of a rebuilt vehicle unless certain requirements are met, such as that the vehicle undergoes an inspection by the Department of Highway Safety and Motor Vehicles, and receives a decal showing the vehicle to be rebuilt. *See also Dep't Hwy Safety and Motor Vehicles v. Kuhn*, 2005 WL 482860 (Fla. Div. Admin. Hrgs. Feb. 1, 2005) (discussing requirements of Fla. Stat. § 319.14).

Here, there is no dispute that the above requirements were never met and that the vehicle was never titled in Florida. While not determinative, it is significant unrebutted evidence of the parties' intent that the title of the Maxima could not have been transferred to Sewsankar at the time of the accident. Indeed, Occidental's argument that the parties intended to immediately transfer ownership of the vehicle upon Sewsankar's $1,000 initial payment is belied by these facts. It defies common sense that Sewsankar would have intended to take ownership of a vehicle that was not even capable of being titled in his name. Rather, that the vehicle was not capable of being titled in

its condition is entirely consistent with Sewsankar's testimony that he had only purchased "an interest" in the vehicle to see if it was repairable.

### 2. Sewsankar did not have beneficial ownership of the Nissan Maxima.

There is no genuine dispute as to the material facts demonstrating that Sewsankar lacked beneficial ownership of the vehicle under Florida law. Indeed, "[t]he name on the title is not the litmus test for determining who owns a vehicle for insurance purposes." *State Farm Mut. Auto. Ins. Co. v. Hartzog*, 917 So. 2d 363, 364–65 (Fla. 1st DCA 2005). Rather, the inquiry is about beneficial ownership. *See id*. "Beneficial ownership is determined by the overt acts" of the parties "at the time of their agreement and thereafter." *Id.*

Here, the Nissan Maxima's salvage certificate apparently still reflects ownership by Main Street. Nonetheless, title is not the only determining factor. *Hartzog*, 917 So. 2d at 364–65. Rather, "[e]xclusive possession and control, taken at the time of the agreement, is a key factor in determining beneficial ownership of a vehicle[.]" *Id*. at 365 (citations omitted). *See also Harrell v. Sellars*, 424 So. 2d 881, 882 (Fla. 1st DCA 1982) (noting that Defendant who "had control over the vehicle," "maintained and stored it," and "had it available for his regular use" was properly considered the vehicle's beneficial owner even though legal title remained in another). The facts here reflect that Sewsankar lacked exclusive possession and control of the vehicle.

The cases cited by Occidental are distinguishable from the instant case and also further support the principle that the parties' intent and overt acts at the time of the agreement are indicative of ownership. In *Palmer v. R. S. Evans, Jacksonville, Inc*., 81 So. 2d 635, 636 (Fla. 1955), the court found that the facts established the parties' intent to transfer ownership where the purchaser signed a sales agreement and took immediate possession of the vehicle from an auto dealer. *See also McAfee v. Killingsworth*, 98 So. 2d 738, 740 (Fla. 1957) (finding that sufficient

evidence existed to satisfy the common law prerequisites for a sale where buyer had taken possession of the vehicle, but testified that he "had not yet decided to purchase" it).

Notably, the facts regarding the two primary factors, the parties' intentions and exclusive possession, are uncontroverted. Sewsankar's undisputed testimony is that the terms of the agreement regarding the Maxima were that he was purchasing only an interest in the vehicle to determine whether it was repairable, that he drove it occasionally for the purposes of a repair, diagnostic test, or test drive, and that he would receive permission from Main Street's manager Teeka Pasaud to drive it. (Doc. 55-5, p. 8). Sewsankar's understanding was that if the Maxima was capable of being repaired, he would have an interest in buying it. (Doc. 57-5, p. 31). Sewsankar explained that, in the interim, the deal was in "limbo" while he explored whether issues with the car could be resolved. (Doc. 57-5, p. 28). If the car was not repairable, his $1,000 payment would go toward a different car. (Doc. 57-5, p. 32). Significantly, there is no evidence that contradicts Sewsankar's testimony regarding his intentions and the intentions of Main Street.

Likewise, the facts regarding possession and control of the vehicle are uncontroverted. Sewsankar testified that he would take the car sometimes for the weekend to work on it, but it was otherwise parked at Main Street. (Doc. 57-5, p. 18-19). While driving the Maxima, Sewsankar would borrow a commercial dealer tag from Main Street or from his brother's business. (Doc. 57-5, p. 21). The keys to the Maxima were kept on a board at Main Street, and if Sewsankar wanted to work on the Maxima he would only take or move the vehicle with permission of Main Street. (Doc. 57-5, p. 28-30).

Although Occidental cites certain facts in support of its motion for summary judgment, none are sufficient to create a genuine issue of material fact regarding beneficial ownership. Occidental cites an unsigned letter by Rex Jiawan, the manager of Main Street, presumably to its

insurer, wherein Sewsankar is described as the "purchaser" of the vehicle and is described as having made a down payment. (Doc. 55-7). Putting aside the issue of whether the letter could be authenticated or whether the statements in the letter would be admissible, a close review reveals that the letter is entirely consistent with Sewsankar's testimony regarding the parties' intentions and behavior. Jiawan states that Main Street "allowed the purchaser. . . permission to drive" the Maxima from Main Street to "an auto repair shop to have the vehicle fixed by an auto mechanic." (Doc. 55-7). The letter further characterizes Sewsankar as having "possession" of the vehicle "during the accident," and further explains that the incident was an anomaly in their policies regarding title transfers. The letter concludes with Jiawan's assurances that Main Street has "instituted a very strict policy" regarding title transfers. (Doc. 55-7). That Sewsankar was referred to as the "purchaser" of the Maxima has little bearing on the parties' intent and overt acts. Even in this letter relied upon by Occidental, Jiawan states that Sewsankar was only driving the vehicle with the "permission" of Main Street and to take it to have repairs made. The letter does not create an issue regarding the elements of Florida law regarding beneficial ownership. Jiawan's characterization is "a mere legal conclusion with no probative effect." *See Hartzog*, 917 So.2d at 365.

Occidental argues that the "overt acts of Persaud and Sewsankar at the time of the agreement clearly demonstrate the intent to transfer ownership of the Maxima to Sewsankar," and that "Sewsankar maintained sufficient control over the vehicle to establish ownership" (Doc. 55 p. 10), but the facts belie that argument. Under Florida law, exclusive possession and control is indicative of beneficial ownership. According to his uncontroverted testimony, Sewsankar had neither exclusive possession nor control. Rather, his testimony reflects that while he had been

liberally granted permission to take the vehicle out on occasions, and even for several days on occasions, the Maxima otherwise remained at Main Street.

Occidental also points to the facts that Sewsankar occasionally put gas in the Maxima, purchased certain repair parts at his own expense, and used his personal SunPass transponder at the time of the accident. Occidental contends that these facts demonstrate that "Sewsankar maintained sufficient control over the vehicle to establish ownership." (Doc. 55, p. 10). To the contrary, these facts are consistent with Sewsankar's testimony regarding his conditional interest in the vehicle. Notably, Occidental has not cited any authority suggesting that these factors, rather than exclusive possession and control, are the determinative factors under Florida law.

After carefully considering the record evidence, the Court finds that Main Street was both the beneficial owner and legal owner of the Nissan Maxima at the time of the accident on September 9, 2017.

### B.  The Combined Garage Exclusion of the Occidental Policy Does Not Apply.

Having determined the ownership of the vehicle, the Court next addresses the implications of Main Street's ownership upon the relevant insurance policies. While Occidental argues otherwise, Liberty contends that the Combined Garage Exclusion/Limitation contained in Occidental's policy issued to Main Street does not apply here to preclude UM coverage to Sewsankar. The provision at issue provides that "No coverage is afforded under the policy for. . . . 'Bodily injury' or 'property damage' occurring after possession of an 'auto' has been surrendered to another person pursuant to sale, conditional sale, gift, abandonment or lease." (Doc. 57-3, p. 15).

Liberty argues that this provision has two requirements: (1) that possession must have been surrendered to Sewsankar; and (2) the surrender must have been pursuant to a "sale, conditional

sale, gift, abandonment or lease." As already established above, the uncontroverted facts demonstrate that Main Street had not surrendered power or control of the vehicle to Sewsankar. Rather, the vehicle remained at Main Street and was only taken by Sewsankar on occasion with the permission of Main Street's manager.

On this issue, Occidental's only response is that there is no coverage under the provision because, as it contends, ownership of the Maxima had transferred to Sewsankar. Occidental does not argue that UM coverage would not apply if ownership of the Maxima remained with Main Street. (Doc. 57, p. 11). Indeed, Occidental concedes that it is obligated to provide UM benefits to vehicles owned by Main Street. (Doc. 55, p. 12).

Occidental also fails to expressly argue that the agreement between Sewsankar and Main Street was a conditional sale and therefore triggers the language of the exclusion. Nonetheless, Liberty points to Florida Statute Sec. 319.22(2) regarding "Transfer of Title," and describes this statute as Florida's conditional sales statute. Liberty contends, without contradiction from Occidental, that Main Street failed to comply with the provisions of the statute. Indeed, the statute contemplates requirements such as endorsing and delivering the certificate of title. It is undisputed that such requirements were not fulfilled by Main Street.

In any event, because Main Street owned the Maxima at the time of the accident and had not surrendered it to Sewsankar, the Combined Garage Exclusion/Limitation of the Occidental Policy does not apply to preclude UM coverage.

### C. Any Coverage Provided by Liberty is Excess Over Coverage Provided by Occidental.

Next, the Court turns to the issue of priority of coverage. On the one hand, Liberty contends that the UM coverage provided by the Occidental policy is primary, and any insurance it provides

is excess. On the other hand, Occidental contends that both it and Liberty should share any loss on a pro-rata basis because the "other insurance" clauses of the two policies are mutually repugnant.

Where more than one policy provides coverage for a loss, the priority of the competing policies should be decided by reference to "other insurance" clause in the respective policies. *See Am. Cas. Co. of Reading Pennsylvania v. Health Care Indem., Inc.*, 613 F. Supp. 2d 1310, 1318 (M.D. Fla. 2009). The Liberty policy regarding Uninsured Motorists insurance contains a provision entitled "Other Insurance" that states:

> If there is other applicable insurance available under one or more policies or provisions of coverage that is similar to the insurance provided under this Uninsured Motorists Coverage . . .
>
> Any insurance we provide with respect to a vehicle you do not own will be excess over any other collectible insurance.

(Doc. 44-2, p. 34). Based on this provision, Liberty contends that the UM coverage provided by Occidental is primary to any coverage it provides, citing *Nationwide Gen. Ins. Co. v. United Services Auto Ass'n*, 715 So. 2d 1119, 1121 (Fla. 1st DCA 1998) (construing the implications of an "other insurance" provision regarding uninsured motorists coverage). Liberty contends that the Occidental policy does not contain "other insurance" language that would make it anything other than primary, pointing to the Form CA 21 72 10 09 of the Occidental policy. (Doc. 44-3, p. 46).

Meanwhile, in its motion for summary judgment, Occidental argues that, if UM coverage is owed under its policy issued to Main Street, Occidental should share the loss on a pro-rata basis with Liberty because the "other insurance" clause of the two policies are mutually repugnant. Occidental, however, fails to respond to Liberty's contention that the Occidental policy does not contain other insurance language that would render the coverage other than primary. Instead, Occidental summarily contends that "[b]oth insurance policies at issue contain 'other insurance' clauses which seek to make the policy at hand excess over other policies which may afford

coverage for a covered loss," and then unhelpfully broadly cites exhibits containing the entire policies. (Doc. 57, p. 15). In doing so, Occidental simply references its 58 page exhibit containing the commercial auto policy and fails to cite or point to any particular provision in support of its contention. While Liberty has clearly identified the specific "other insurance" provision in its policy that it contends applies, Occidental has not identified a similar provision in its policy, despite having ample opportunity to do so. Notably, both Occidental's motion for summary judgment and its response to Liberty's summary judgment motion address this issue, but both conspicuously fail to contain a specific cite to the supposed provision in the Occidental policy that would compete with Liberty's provision. (Docs. 55 & 57).

Despite Occidental's failure to identify any provision in support of its argument, the Court notes that, within the UM coverage portion of the Occidental policy, there is an "other insurance" provision that provides:

> Any insurance we provide with respect to a vehicle the Named Insured does not own shall be excess over any collectible uninsured motorists insurance coverage providing coverage on a primary basis.

(Doc. 55-2, p. 46). This provision, however, is inapplicable here because the named insured, Main Street, did own the automobile at issue. The policy further provides, "[o]n a primary basis, we will pay only our share of the loss that must be paid." (Doc. 55-2, p. 46).

Occidental has failed to identify any provision that would compete with the "other insurance" provision in the Liberty policy, and the Court has identified none that would apply to the situation at hand. It thus appears that the plain meaning of Liberty's "other insurance" provision should be given effect. The Court finds that any UM insurance provided by Liberty is excess over other collectible insurance, namely the insurance provided by Occidental.

### D.  The UM Limits of the Occidental Policy Issued to Main Street are $20,000.

Next, the Court turns to the final issue raised by the parties' summary judgment motions. Liberty seeks a declaration that the UM limits of the Occidental policy must equal the bodily injury limits of $100,000. Meanwhile, Occidental moves for summary judgment that its policy issued to Main Street only affords UM coverage in the amount of $20,000.

Florida Statute § 627.727(2) provides:

> The limits of uninsured motorist coverage shall not be less than the limits of bodily injury liability insurance purchased by the named insured, or such lower limit complying with the rating plan of the company as may be selected by the named insured.

Florida law also provides for the rejection of UM coverage or the selection of limits lower than the limits of bodily injury liability insurance. Florida Statute § 627.727(1) provides, in relevant part:

> The rejection or selection of lower limits shall be made on a form approved by the office. The form shall fully advise the applicant of the nature of the coverage and shall state that the coverage is equal to bodily injury liability limits unless lower limits are requested or the coverage is rejected. The heading of the form shall be in 12-point bold type and shall state: "You are electing not to purchase certain valuable coverage which protects you and your family or you are purchasing uninsured motorist limits less than your bodily injury liability limits when you sign this form. Please read carefully." If this form is signed by a named insured, it will be conclusively presumed that there was an informed, knowing rejection of coverage or election of lower limits on behalf of all insureds . . . .

Thus, citing *GEICO Indem. Co. v. Perez*, 260 So. 3d 342, 351 (Fla. 3d DCA 2018), Liberty contends that there are four independent requirements that a UM rejection or selection form must meet before the conclusive presumption applies: (1) approval by the Florida Office of Insurance Regulation; (2) an explanation of what UM coverage is; (3) a discussion of the limits that are applicable unless coverage is rejected; and (4) the following disclaimer as a heading on the form in 12-point bold: "You are electing not to purchase certain valuable coverage which protects you

and your family or you are purchasing uninsured motorist limits less than your bodily injury liability limits when you sign this form. Please read carefully."

Here, Liberty questions whether the form upon which Main Street selected its UM coverage was approved by the Florida Office of Insurance Regulation, and suggests that the use of an unapproved form would result in Occidental not being entitled to the conclusive presumption regarding lower limits. In response, however, Occidental offers a copy of Form Acord 61 FL (2003/12) with the Florida Office of Insurance Regulation's stamp of approval. (Doc. 55-8). Occidental has also provided the from that was signed and executed on behalf of Main Street. (Doc. 55-3). The executed form is identical in all respects to the approved form, and contains all the statutory requirements. Importantly, it also clearly indicates the selection of uninsured motorist limits lower than bodily injury liability limits, and reflects a selection of $20,000 combined single limit. (Doc. 55-3). The document is signed and dated September 30, 2016.

Liberty, however, challenges Occidental's assertion that Main Street's owner, Tika Persaud, selected UM limits in an amount lower than the bodily injury liability limits. Liberty states that it does not accept "as unchallenged" that the form was signed by Persaud and contends that there is no record evidence to support that assertion. Liberty also contends that there is a conflict in the application documents, because the Garage Application form, signed on September 29, 2016, lists UM limits of $30,000. (Doc. 44-8). Liberty, however, cites no authority for the proposition that the limits requested on an application, especially one executed a day prior to the approved election of uninsured motorists coverage form, would have any impact on the conclusive presumption crated by Florida Statute § 627.727(1).

Thus, the only issue remaining is Liberty's refusal to accept that the UM selection form was signed by Main Street's owner, Tika Persaud. To be sure, Liberty has offered no evidence to

the contrary; Liberty merely refuses to accept Occidental's representation. Liberty contends that Occidental "has not established the facts set out" in its motion.

Liberty's argument, however, misapprehends the proper summary judgment standards. Under Federal Rule of Civil Procedure 56, Occidental has moved for summary judgment that its policy with Main Street only affords coverage for UM benefits in the amount of $20,000. In compliance with Rule 56(c)(1), Occidental has presented documents supporting its assertion, including the Uninsured Motorists Insurance Selection Form Accord 61 FL (2003/12) that appears to be signed and dated by a representative of Main Street. Such a document may be properly considered on a motion for summary judgment. *See The Lamar Co. v. City of Marietta, Ga.*, 538 F. Supp. 2d 1366, 1377 (N.D. Ga. 2008) (noting that the court "may consider unauthenticated documents on a motion for summary judgment if it is apparent that they will be admissible at trial").

While Rule 56(c)(2) contemplates that a "party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence," what Liberty argues here is simply that it does not accept Occidental's assertion. Notably, Liberty does not argue that the form would be inadmissible, nor does it offer any evidence whatsoever to suggest a genuine issue actually exists. Here, Occidental has proffered a signed copy of the form and thus has carried its burden by showing that there is an absence of evidence supporting Liberty's (the non-movant on this issue) case. Accordingly, the burden then shifts to Liberty, who must go beyond the pleadings and present affirmative evidence to show a genuine issue for trial. *See Porter v. Ray,* 461 F.3d 1315, 1320 (11th Cir. 2006). On this issue regarding whether an authorized representative of Main Street executed the UM selection form thus triggering the statutory conclusive presumption, Liberty has failed to present any such affirmative evidence.

Based upon the above facts and analysis, I submit that Occidental is entitled to summary judgment that its policy issued to Main Street only affords coverage for UM benefits in the amount of $20,000.

### IV. CONCLUSION

Upon due consideration, and consistent with the above findings, I respectfully recommend that the motion for summary judgment on behalf of LM Insurance Company (Liberty) (Doc. 44) be granted to the extent that the Court finds that Main Street owned the 2008 Nissan Maxima and that Occidental policy issued to Main Street provides UM coverage to Harnauth Sewsankar that is primary to any coverage provided by Liberty, and that the motion otherwise be denied. I further recommend that the motion for summary judgment on behalf of Occidental Fire and Casualty Company of North Carolina (Doc. 55) be granted to the extent that the Court find that the Occidental policy issued to Main Street only affords UM benefits in the amount of $20,000, and that the motion otherwise be denied. Consequently, I recommend that the Court declare that: (1) the Occidental policy issued to Main Street provides UM coverage to Harnauth Sewsankar that is primary to any coverage provided by Liberty; and (2) The Occidental policy issued to Main Street only affords UM benefits in the amount of $20,000.

Finally, I note that the motion to strike testimony of T. R. Eunice, Jr. (Doc. 53) and the motion to strike the testimony of Thomas Bailey (Doc. 37) are rendered moot by the above recommendations.[2]

---

[2] Alternatively, as both disputed experts intend to opine regarding whether a transfer of ownership of the Maxima occurred, their proposed testimony amounts to mere legal conclusions with no probative value. *See Hartzog*, 917 So.2d at 365. In the case of both proposed experts, Eunice and Bailey, their proposed expert testimony regarding whether a transfer in ownership occurred is improper.

Recommended in Ocala, Florida on June 15, 2020.

PHILIP R. LAMMENS
United States Magistrate Judge

Copies furnished to:

Presiding District Judge
Counsel of Record
Unrepresented Party
Courtroom Deputy